# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

CESAR A. FLORES,
       Plaintiff

     v.

COLLEGE OF DUPAGE,
       Defendant

No. 24 CV 1687

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Defendant College of DuPage's (COD) motion for summary judgment on Plaintiff Cesar Flores' claims under Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e *et seq.* (R. 61.)[1]. Specifically, the defendant asserts that it is entitled to summary judgment on all claims because the plaintiff cannot show that (1) he was discriminated against on the basis of race or national origin, (2) the defendant retaliated against him, and (3) he was constructively discharged. (*Id.*) For the reasons below, the motion is granted.

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[2] the materials cited therein, and other aspects of the record in this case.

### I. THE PLAINTIFF'S TENURE AS INTERIM DEAN OF ENROLLMENT

The plaintiff began his employment at COD in November 2001 as an administrative assistant. (Pl. Resp. to Def. SOF ¶ 2.) He was promoted to admissions counselor and, later, Manager of Registration Services. (*Id.* ¶¶ 3–4.) During his tenure at COD, he consistently received annual evaluations of "Meets Expectations" or "Exceeds Expectations," (Def. Resp. to Pl. SOF ¶ 2), and he worked to grow enrollment and implement COD's Strategic Enrollment Plan. (*Id.* ¶ 3.) The plaintiff became Interim Dean of Enrollment in April 2020. (Pl. Resp. to Def. SOF ¶ 5.) He was appointed to this role by Diana Del Rosario, Assistant Provost for Student Affairs, and reported directly to her. (*Id.* ¶¶ 5–6.) He was reappointed to this role twice, in February 2021 and February 2022. (*Id.* ¶ 8.)

### II. ETHICS COMPLAINTS

#### A. Case Nos. 92 and 96

At all times relevant to this litigation, COD maintained a hotline where individuals could anonymously report ethical breaches at COD. (Def. Resp. to Pl. SOF ¶ 8.) James Martner, Director of Compliance and Audit, oversaw and investigated hotline complaints. (*Id.*) In September 2020, an anonymous employee filed an ethics

---

[2] Defendant's Statement of Undisputed Material Facts ("Def. SOF") (R. 62); Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Pl. Resp. to Def. SOF") (R. 70); Plaintiff's Statement of Additional Facts Pursuant to Local Rule 56.1(B)(3)(c) ("Pl. SOF") (R. 71); Defendant's Response to Plaintiff's Statement of Additional Facts ("Def. Resp. to Pl. SOF") (R. 75.)

complaint, Case No. 92, alleging that the plaintiff directed staff to update the roster verification of all reenrolled students to indicate that they had been attending classes, even though some of them were not actively attending. (*Id.* ¶ 10.) Another complaint was filed in October, Case No. 96, supplementing Case No. 92 but adding that these actions may have impacted students' financial aid. (*Id.* ¶ 11.) In November, Martner submitted a report to the Audit Committee of the Board of Trustees and Brian Caputo, President of COD, finding that the statements were correct and that the plaintiff, as Interim Dean, was responsible. (*Id.* ¶ 12.)

### B.    Case No. 111

In August 2021, an anonymous employee filed an ethics complaint alleging that the plaintiff initiated a program that allowed salaried, exempt classified employees to receive overtime pay despite their work being completed during regularly scheduled hours. (*Id.* ¶ 13.) It also alleged that employees used leave time during the weeks they worked in the program. (*Id.*) In November, Martner submitted a report to the Audit Committee and Caputo, which found that the plaintiff did offer exempt employees the ability to earn overtime pay. (*Id.* ¶ 14.) In February 2022, the plaintiff received a verbal warning regarding this case. (*Id.* ¶ 16.) The verbal warning included the plaintiff's failure to seek guidance from Human Resources regarding how to handle compensation for exempt classified employees participating in the program. (*Id.*)

### C.    Case No. 119

In June 2022, a self-identified employee submitted an ethics complaint alleging that the plaintiff required her to enter a purchase transaction in COD's accounting

system that she did not believe complied with COD procedures. (*Id.* ¶ 18.) In July, Martner submitted a report to the Audit Committee and Caputo, finding that the plaintiff initiated a purchase transaction for $4,900 prior to getting a detailed quote from the vendor and required approvals. (*Id.* ¶ 19.) The report also found that the plaintiff had acted in an unprofessional and unethical manner toward the employee, substantiating the employee's concerns of retaliation. (*Id.* ¶ 20.)

### D. Case No. 123

In July 2022, an anonymous employee filed an ethics complaint alleging that the plaintiff planned to hire two temporary COD employees from a contract service who had reached the end of their assignments, and that the hourly rates that the employees received were higher than the contracted rate that was approved by the Board of Trustees. (*Id.* ¶ 21.) Martner submitted a report to the Audit Committee and Caputo, finding that the plaintiff authorized the use of funds to request a specific temporary worker from the contract service, knowing that their position had ended and that his previous request to retain that employee was denied. (*Id.* ¶ 23.) The report also found that the plaintiff had acted dishonestly in his dealings with coworkers and Internal Audit. (*Id.* ¶ 24.)

### E. Case No. 141

In April 2023, an anonymous employee filed an ethics complaint alleging that the plaintiff was not coming to work and covered the window of his office door with paper. (*Id.* ¶ 24.) In July 2023, Matt Jarzynski, Human Resources Partner, submitted an Internal Audit report confirming that the plaintiff had window coverings until

March 2023, when he removed them on the day he resigned. (*Id.* ¶ 25.) Because he resigned voluntarily, the investigation closed. (*Id.*)

### III.    APPLICATION FOR PERMANENT DEAN POSITION

In May 2022, the plaintiff applied for the permanent Dean of Enrollment position at COD after Del Rosario informed him of the position's opening one week before it was posted. (*Id.* ¶ 27.) The search committee recommended the plaintiff as the top candidate for the position, and Del Rosario implied to the plaintiff that he would be selected for the position. (*Id.* ¶¶ 33–34.)

In June 2022, the plaintiff participated in one of fifteen focus group sessions commissioned by COD's Office of Research and Analytics to explore the impact of administrative policies, processes, and procedures on the staff. (*Id.* ¶¶ 28–29.) In this session, the plaintiff raised the issue of salary inequities based on gender. (*Id.* ¶ 28.) In August 2022, the plaintiff emailed Human Resources and Del Rosario raising the issue of pay inequities related to the potential hiring of his own administrative assistant at COD; the email did not specify that the inequities were based on race, national origin, gender, or any other protected class. (*Id.* ¶ 35.) The email included the following language:

> If you haven't already, I suggest reading the "Focus Groups on COD Policies, Processes and Procedures (August 2022)" located on the Research and Planning TeamSite for all staff to see. It highlights the struggles many of us in the College are experiencing, for example: "Managers have lost candidates due to, the time it takes to extend job offers, lack of a work from home policy, and salaries and benefits not being competitive."

(*Id.* ¶ 36; *see also* R. 62-12 at 1 (formatting omitted).)

Shortly after receiving this email, Del Rosario submitted the plaintiff's name as a hiring recommendation for the permanent Dean of Enrollment position. (Pl. Resp. to Def. SOF ¶ 37.) In September, Del Rosario informed the plaintiff that Caputo would not be advancing the plaintiff's nomination due to the ethics complaints against him. (*Id.* ¶ 38.) This was the first instance that Caputo had rejected a recommendation for a position. (*Id.*) According to the plaintiff, the complaints and Martner's reports were pretext for the decision to not advance his nomination. (*Id.* ¶ 40.) Del Rosario explained to the plaintiff that there were concerns about the plaintiff's decision-making and that the Board of Trustees would not approve the nomination of someone who had been investigated for management missteps. (*Id.* ¶ 43.) However, she did not believe that the promotion denial was based on anything except the ethics complaints. (*Id.* ¶ 44.)

The plaintiff emailed the Board of Trustees requesting reconsideration after learning that his nomination would not be advanced. (*Id.* ¶ 46; *see also* Def. Resp. to Pl. SOF ¶ 6.) After COD reposted the position, Dr. Darrius Douglas, an African American male, was chosen. (Pl. Resp. to Def. SOF ¶¶ 47–48.) The plaintiff then became Manager of Enrollment Systems, in which he earned a salary of about $75,000; his salary in his role as Manager of Registration Services was about $50,000, and his salary as Interim Dean of Enrollment was about $122,000. (*Id.* ¶¶ 49, 65; Def. Resp. to Pl. SOF ¶ 32; R. 62-19 at 2.)

IV. **PERFORMANCE IMPROVEMENT PLAN**

In October 2022, the plaintiff was placed on a Performance Improvement Plan (the "PIP") by Human Resources and Del Rosario to address issues related to

procurement expectations, staffing and overtime process expectations, and ethical expectations. (*Id.* ¶¶ 50–51; *see also* Def. Resp. to Pl. SOF ¶ 7.) Del Rosario met with the plaintiff to discuss the substance of the PIP, and she believed that, had the plaintiff remained at COD, he would have successfully completed the plan and been removed from it. (Pl. Resp. to Def. SOF ¶¶ 52–53.) The plaintiff believed that the PIP was implemented in response to his email to the Board of Trustees regarding his nomination. (*Id.* ¶ 54.) Caputo was not involved in the implementation of the plaintiff's PIP. (*Id.* ¶ 56.)

## V.   IDHR AND EEOC CHARGES

In October 2022, the plaintiff filed a charge of discrimination against COD with the Illinois Department of Human Rights ("IDHR Charge"), which was perfected in March 2023. (*Id.* ¶ 57.) The Equal Employment Opportunity Commission (EEOC) acknowledged this charge. (R. 61 at 4; *see also* R. 62-18 at 2.) In the IDHR Charge, the plaintiff alleged that he was subject to harassment, retaliation, failure to promote, and unequal terms and conditions based on his race/ancestry and national origin—Hispanic and Mexican, respectively. (Pl. Resp. to Def. SOF ¶ 58.) The failure to promote claim alleged that Caputo did not promote the plaintiff because of "a Hotline complaint regarding the purchase of pens for a student event," which the plaintiff identified as the basis for his failure to promote claim. (*Id.* ¶ 59.) As to the bases of the harassment claim, the plaintiff identified the denial of the promotion, the ethics complaints and related investigations, and Caputo's refusal to correct the plaintiff's incorrectly spelled name in a COD publication. (*Id.* ¶ 60.) Finally, the retaliation claim incorporates the above-named allegations and adds the focus group

participation and his email to the Board appealing the denial of his promotion. (*Id.* ¶ 61.) In November 2023, the IDHR issued a Notice of Dismissal of the plaintiff's charge based on a lack of substantial evidence. (*Id.* ¶ 62; *see also* R. 62-17 at 3.)

### VI.    RESIGNATION FROM COD

In early May 2023, an unnamed employee filed a complaint against the plaintiff alleging that he had a privacy film in his office windows and that he was often absent from his office. (R. 62-19 at 3.) He was later instructed to remove the film even though other employees also had privacy film on their office windows. (*Id.*) He was also told he could not carry over his vacation time to the next fiscal year, even though he believed that the Interim Dean role made it difficult for him to take vacation. (*Id.*) On May 31, 2023, the plaintiff resigned from his position at COD. (Pl. Resp. to Def. SOF ¶ 64.) In his letter of resignation, he said that he was forced to resign due to hostile, discriminatory, and retaliatory behavior toward him, including the PIP, denial of his promotion, denial of a pay raise due to the PIP, the creation of his new position, and the ethics complaints. (*Id.* ¶¶ 65–66.) He noted that Del Rosario did not contribute to his discrimination. (*Id.* ¶ 67.)

### VII.   THIS CASE

On February 28, 2024, the plaintiff filed his initial complaint against COD and Martner, alleging race and national origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act (IHRA). *See* 42 U.S.C. §§ 2000e *et seq.*; 775 ILCS 5/2-101 *et seq.* This Court granted in part and denied in part the defendants' first motion to dismiss. (*See* R. 24, *generally.*) Martner was terminated as a defendant in this case shortly after the plaintiff filed his first

amended complaint. (R. 30, *generally*.) In the Second Amended Complaint, the plaintiff added the constructive discharge claim. (Pl. Resp. to Def. SOF ¶ 70; *see also* R. 25, *generally*.)[3]

## LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the Court draws all inferences in the light most favorable to the nonmoving party. *Id.* at 255. However, the nonmoving party cannot rely on mere conjecture or speculation to manufacture a genuine issue of material fact. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

The plaintiff brings claims under Title VII and the IHRA. 42 U.S.C. § 2000e, *et seq*; 775 ILCS 5/1-101, *et seq*. "The analytical framework for [Title VII, the IHRA, and § 1981] is 'essentially identical'" and thus may be addressed simultaneously under the same framework. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016) (citing *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012); *Zaderaka v. Ill. Hum. Rts. Comm'n*, 545 N.E.2d 684, 687 (Ill. App. 1989)).

---

[3] The plaintiff also alleged additional facts—related to mispronunciations of his name or being called other names of Hispanic descent from 2006—that are not actionable because they were not included in the plaintiff's original IDHR Charge. (Pl. Resp. to Def. SOF ¶¶ 77–80.)

## ANALYSIS

### VIII. RACE AND NATIONAL ORIGIN DISCRIMINATION

The defendant seeks summary judgment on Counts I, II, IV, and V, which allege race and national origin discrimination under federal and state law. The defendant argues that the plaintiff failed to show race and national origin discrimination. (R. 61 at 8–15.) Under Title VII and the IHRA, a plaintiff establishes a *prima facie* showing of discrimination by demonstrating that (1) he is a member of a protected class; (2) his job performance met the defendant's legitimate job expectations; (3) the plaintiff was subjected to adverse employment action; and (4) the defendant treated a similarly situated individual not in the protected class more favorably. *Bagwe*, 811 F.3d at 880; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Zaderaka*, 545 N.E.2d at 687. If the plaintiff establishes the *prima facie* case, the burden of proof shifts to the defendant, which must show a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant does this, then the burden shifts once again back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual. *Id.* For the reasons that follow, the Court grants summary judgment to the defendant on Counts I, II, IV, and V because the plaintiff failed to provide evidence sufficient to make a *prima facie* showing of discrimination.

The parties do not dispute that the plaintiff is a member of a protected class as a Hispanic man of Mexican descent. (Pl. Resp. to Def. SOF ¶ 58; R. 61 at 9.) The parties also agree that the plaintiff was not promoted to the position of permanent Dean of Enrollment, which constitutes an adverse employment action under Title VII. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 n.1 (7th Cir. 2004); (Pl. Resp. to

Def. SOF ¶ 38). The parties dispute whether the plaintiff met the defendant's legitimate job expectations and whether the defendant treated a similarly situated individual more favorably.

The plaintiff cannot make a *prima facie* showing of discrimination because he fails to provide sufficient evidence that the defendant treated a similarly situated individual not in the protected class more favorably. The plaintiff identified Craig Heavens (Manager of Information Systems), Eugene Refakes (Manager of Financial Systems), and Michelle Olson-Rzeminski (Manager of Employment Systems) as similarly situated White, non-Hispanic employees whom the defendant paid more than the plaintiff. (R. 72-1 at 111–13.) He also notes that the defendant promoted Olson-Rzeminski to her position after only six years, as opposed to the ten years before he was promoted to Manager of Registration Systems. (*Id.*) The defendant argues that these individuals are not similarly situated and that the plaintiff has not explained how these employees were treated more favorably. (R. 61 at 14.)

"Similarly situated means 'directly comparable' in all material respects." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (citing *Reed v. Freedom Mortg.*, 869 F.3d 543, 549 (7th Cir. 2017)). "The objective is to eliminate other possible explanatory variables such as differing roles, performance histories, or decision-making personnel, in order to isolate the critical independent variable of discriminatory animus." *Reed*, 869 F.3d at 549. It is material to this claim that the plaintiff is Mexican, had a positive work performance history, was passed over for a promotion, and had a number of ethics complaints against him.

11

The plaintiff has not provided sufficient evidence that these employees were similarly situated to him such that the decision not to promote him was discriminatory. Olson-Rzeminski is Manager of Employment Systems (Pl. Resp. to Def. SOF ¶ 73), but the plaintiff was Manager of Registration Systems (*id.* ¶ 4). While he testified that they have similar qualifications, (R. 72-1 at 111–12), and titles, (*id.* at 94), that she was promoted sooner than the plaintiff was, (*id.* at 112–13), and that she was subject to an ethics complaint, (*id.* at 96), the plaintiff does not provide any evidence of her disciplinary history, her employment history prior to COD, the contours of her responsibilities compared to his, or who presided over the decision to promote her. Further, her promotions appeared to be within the managerial level, while the plaintiff was seeking a promotion to a dean-level position. (*Id.* at 94.) This is not enough evidence for a reasonable jury to conclude that the plaintiff was similarly situated to Olson-Rzeminski or any other of these employees.

Further, the plaintiff does not provide evidence to show that these employees were treated more favorably than he was. While the plaintiff provides evidence that these employees were paid more than him, he does not bring a discrimination claim related to his pay, so the point does not bear on the allegations of discrimination in this case. (*See* R. 62-19 at 2; R. 72-1 at 111.) He does not provide any other comparators beyond pay to support the assertion that these were similarly situated employees who were treated more favorably than him. As stated above, Olson-Rzeminski's promotion was to the Manager level, but there is no information about

12

the circumstances of that promotion to allow a significant comparison to the plaintiff's position. (R. 72-1 at 94.)

Beyond his *prima facie* case, the plaintiff also fails to show that the ethics complaints were pretextual. To show pretext, a plaintiff must present evidence that the employer's proffered explanation against the *prima facie* showing of discrimination is "[a] lie, specifically a phony reason for some action, not just faulty reasoning or mistaken judgment on the part of the employer." *Bragg v. Munster Med. Rsch. Found., Inc.*, 58 F.4th 265, 273 (7th Cir. 2023) (citing *Barnes v. Board of Trustees of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020)) (internal quotations omitted). A plaintiff can do so by showing "(1) [the] Defendant's explanation of [the action taken toward the plaintiff] had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) at least the reason stated was insufficient[.]" *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir. 1994) (citing *Smith v. Gen. Scanning, Inc.*, 876 F.2d 1315, 1319 (7th Cir. 1989)). "The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)).

The parties do not dispute that the hotline was overseen by Martner, that it allowed individuals to submit anonymous complaints, and that Martner had primary responsibility for investigation of complaints. (Def. Resp. to Pl. SOF ¶ 8–9.) They also

13

do not dispute that at least senior executives had complained about the hotline. (*Id.* ¶ 16.) The plaintiff argues that this evidence shows that the hotline "was unreliable, unverified, and misused" and that the complaints against him were thus "trivial or baseless." (*Id.* ¶ 10.) While this may be true, the complaints against the plaintiff were also investigated and substantiated after investigation. (*Id.* ¶ 9.) The plaintiff has not presented evidence that the complaints "had no basis in fact," "[were] not the real reason," or "[were] insufficient" to warrant the denial of his promotion. *Lenoir*, 13 F.3d at 1133. No reasonable jury could find that the complaints could not constitute legitimate, nondiscriminatory reasons for the denial of his promotion. The Court therefore grants summary judgment to the defendant as to Counts I, II, IV, and V of the plaintiff's second amended complaint. (R. 33 ¶¶ 47–62, 72–93.)

## IX. RETALIATION

The defendant next argues that the plaintiff fails to show retaliation as alleged in Counts III and VI. (R. 61 at 15–23.) Under Title VII and the IHRA, a plaintiff establishes retaliation by showing that "(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). A protected activity is "some step in opposition to a form of discrimination that the statute prohibits." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). An employee "need not show that the practice he opposed was in fact a violation of the statute"; he simply must have a "good-faith and reasonable belief that he is opposing unlawful conduct." *Id.* And the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse

14

action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 361–62 (2013).

## A. Denial of Promotion

The plaintiff alleges that he engaged in three instances of protected activity for which he was retaliated against. (R. 73 at 4; Pl. Resp. to Def. SOF ¶¶ 28–32.) The first two were his participation in a focus group in June 2022 and his sending an email in August 2022 to leadership about administrative assistants' salary inequities. (*Id.*) He claims that these were the bases for the denial of his promotion in September 2022. (Pl. Resp. to Def. SOF ¶ 61.) The defendant argues that (1) the plaintiff's participation in the focus group was too attenuated from his promotion being denied to causally connect the two, (2) the focus group could not have been the cause of his non-promotion, (3) his email to leadership was not a protected activity, and (4) even if it was a protected activity, the plaintiff fails to causally connect the email to his non-promotion. (R. 61 at 15–22.) The Court addresses each argument in turn.

The parties do not dispute that the focus group was convened to follow up on the results of a climate survey to identify improvements, priorities, and strategies, eventually culminating in a report on the same. (Pl. Resp. to Def. SOF ¶¶ 29–32.) They also do not appear to dispute that the plaintiff brought up issues of salary inequities in this meeting. (*Id.* ¶ 28.) However, the parties do dispute whether Caputo was involved in the focus groups or report and whether he knew of their existence. (Pl. Resp. to Def. SOF ¶ 41.) They also dispute the reason that Caputo chose not to advance the plaintiff's nomination: discrimination (according to the plaintiff) or the ethics complaints (according to the defendant). (*Id.* ¶ 40.) The plaintiff cites the focus

15

group report, in which the President's Office is listed as having participated in the focus groups. (R. 62-10 at 7.) Caputo testified that he did not recall requesting a focus group report, nor could he recall the report itself. (R. 62-13 at 67–68.)

The defendant argues that the plaintiff has not provided sufficient evidence that, but for the plaintiff's participation in the focus group, Caputo would have chosen to advance his nomination for the position. (R. 61 at 17–18.) Construing the disputed facts in the plaintiff's favor, the Court nonetheless agrees with the defendant. Caputo testified that the reasons for his decision not to advance the plaintiff's nomination were the ethics complaints and the plaintiff's perceived dishonesty during the investigations. (R. 62-13 at 51–53.) Even if Caputo did place some weight on the plaintiff's participation in the focus group, the plaintiff has failed to show that ethics complaints were not the reason he was denied for a promotion. This precludes the plaintiff's assertion that the focus group was the but-for cause of his promotion denial. Because of this, the Court does not address the argument that the focus group was too attenuated in time from the denial of the promotion to break the causal chain. (*See* R. 61 at 18–19.)

The defendant argues next that the email the plaintiff sent to Human Resources and Del Rosario did not constitute a protected activity because it did not "oppose conduct prohibited by Title VII." *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997); (R. 61 at 19–21.) The parties do not dispute that the plaintiff sent an email to Human Resources and Del Rosario regarding salary inequities related to the potential hiring of an administrative assistant. (Pl. Resp. to Def. SOF

¶¶ 35–36; *see also* R. 62-12, *generally*.) There is also no dispute that the email does not specify that the inequities were based on race, national origin, or gender.[4] (*Id.*) Protected activity, as defined under Title VII, must oppose conduct that is violative of Title VII—namely, employment discrimination based on "race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2. The email in question does not mention race, national origin, or gender, nor does it mention another protected category. (*See* R. 62-12 at 2.) The conduct it opposes is the defendant's decision to give an administrative assistant a lower salary than other assistants based on a staff pay rate chart. (*Id.*) And the plaintiff's mention of the focus group report, specifically its focus on managers' difficulty in hiring, also does not implicate race, national origin, or gender. (*Id.*) The Court holds that the email is therefore not a protected activity.

### B. Institution of PIP and Alleged Demotion

The defendant argues that the PIP is not retaliatory because it was instituted in response to the plaintiff's ethics complaints. (R. 61 at 22–23.) The plaintiff claims this reason was pretextual, arguing that the PIP was instituted instead because of an email he sent to the Board of Trustees on September 6, 2022 after his promotion was denied, and that his demotion followed. (Pl. Resp. to Def. SOF ¶ 46.) The parties do not dispute that the PIP was instituted around October 5, 2022, and purported to address three areas of improvement: "procurement expectations, staffing and overtime process expectations[,] and ethical expectations." (*Id.* ¶¶ 50–51.)

---

[4] The plaintiff, in other places, attempts to argue that it does. (Def. Resp. to Pl. SOF 5; R. 73 at 4.) However, where the record contradicts the non-movant's assertions, the record controls. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The parties do not appear to dispute that the plaintiff's email to the Board of Trustees constituted a protected activity. (R. 61 at 16.) The parties do dispute facts related to other elements of the retaliation claim. First, they dispute that the plaintiff's transfer to the position following Interim Dean of Enrollment, which the plaintiff says was an adverse employment action, constituted a demotion. (Def. Resp. to Pl. SOF ¶ 32.) Second, they dispute that the PIP was causally connected to the email. (Pl. Resp. to Def. SOF ¶ 54.)

Reading the PIP and alleged demotion as parts of the same retaliation claim, the Court finds that the plaintiff has not provided evidence that he suffered an adverse employment action. First, the Seventh Circuit has repeatedly found that "[p]erformance improvement plans, particularly minimally onerous ones . . . are not, without more, adverse employment actions." *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011); *see also Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (finding that performance improvement plan was not an adverse action even though employee was required to submit daily and weekly schedules to her supervisors); *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 913 (7th Cir. 2025) ("[The defendant's] decision to place [the plaintiff] on a performance action plan—absent any reduction in pay or imposition of other adverse employment conditions—would on its own not be sufficient to establish constructive discharge.").

Second, to the extent that the plaintiff argues the transfer to his position following Interim Dean of Enrollment was a demotion, the Court disagrees. The plaintiff's role was an interim one, meaning it was necessarily temporary. He has not

18

provided evidence that the new position was a demotion, save for the fact that he was put into a new position and was no longer Interim Dean after COD had hired a new permanent dean. Further, the plaintiff's salary after his term as Interim Dean was $75,000, an increase from his $50,000 salary prior to his term. (Def. Resp. to Pl. SOF ¶ 32.) Given this information, a reasonable jury could not find that the plaintiff was subject to an adverse employment action as required for a Title VII retaliation claim, and the Court grants summary judgment to the defendant on Counts III and VI.

## X.    CONSTRUCTIVE DISCHARGE

Finally, the defendant argues that the plaintiff failed to show constructive discharge as alleged in Counts VII and VIII. (R. 61 at 23–25.) The Seventh Circuit recognizes two forms of constructive discharge. The first form is when, "from the standpoint of a reasonable employee, the working conditions become unbearable." *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015). The conditions "must be intolerable because of unlawful discrimination." *Drake v. Minn. Min. & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998). "Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim . . . ." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The second form occurs "when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). The plaintiff alleges that he was constructively discharged in the first form. (*See* R. 33 ¶¶ 103–22.)

The parties do not dispute that the plaintiff resigned on May 31, 2023. (Pl. Resp. to Def. SOF ¶ 64.) They also do not appear to dispute that the plaintiff's stated

reasons for resignation were the hostile work environment he allegedly experienced engendered by the existence of the PIP, his inability to receive a pay raise due to the PIP, and the ethics complaints. (*Id.* ¶¶ 65–66; R. 62-19 at 2.)

The parties do dispute, however, whether the named reasons for resignation constitute unbearable working conditions such that the plaintiff experienced constructive discharge. (Def. Resp. to Pl. SOF ¶ 33.)[5] The defendant argues that the plaintiff does not show constructive discharge because the facts alleged, even if true, do not rise to unbearable working conditions constituting constructive discharge. (R. 61 at 24.) The Seventh Circuit has found constructive discharge where a Black man resigned from a company where he worked with his White wife after, among other acts, republication of a rule barring family members working together; this republication came right after company executives met the couple and made disparaging comments regarding interracial marriages. *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198 (7th Cir. 1992). On the other hand, the Seventh Circuit has not found constructive discharge where a Mexican employee resigned after her boss repeatedly used racial slurs and insulted Mexican people's intelligence, *Bannon v. Univ. of Chicago*, 503 F.3d 623 (7th Cir. 2007), where unknown individuals wrote racial slurs on a Black employee's lunchbox, *Wince v. CBRE, Inc.*, 66 F.4th 1033 (7th Cir. 2023), or where a Black employee was shunned by other White employees after

---

[5] The defendant asks the Court to strike Paragraph 33 in the plaintiff's Rule 56.1 Statement of Additional Facts because it cites to the Second Amended Complaint as evidentiary support for the factual proposition. The Court agrees that this is not sufficient evidentiary support but cites it here to demonstrate that the parties disagree.

being quoted in an article regarding racial tensions at their workplace, *Drake*, 134 F.3d at 886–87.

In this case, no reasonable jury could find that the working conditions that the plaintiff alleges constitute constructive discharge. Lodging complaints and instituting a PIP are not examples of behaviors that are so unbearable and intolerable that they would cause a reasonable employee to resign from their job—indeed, the Seventh Circuit has ruled that there was no constructive discharge on allegations much more severe than the plaintiff's. *See Bannon*, 503 F.3d 623; *Wince*, 66 F.4th 1033; *Drake*, 134 F.3d 878.

The plaintiff has also failed to show evidence that the requirements of the PIP, beyond simply its institution, were unbearable. The PIP required the plaintiff to complete two trainings, read the College policies and procedures, provide verification of consultations with the purchasing team when pursuing transactions, consult with Human Resources about staffing re-allocations, and submit work product in a timely manner. (R. 62-16 at 2–3.) No reasonable jury could conclude that these requirements were unreasonable, let alone unbearable or intolerable so as to constitute constructive discharge. And even if they were unbearable, the plaintiff has not established that these actions were taken in connection with his race or national origin. *See Drake*, 134 F.3d at 886. He notes that Martner was dismissive when the plaintiff claimed the complaints were discriminatory, but that does not, without more, constitute discrimination. (R. 72-1 at 138.) The evidence also shows that the ethics complaints were substantiated independently of the reporting parties' allegations. (*See* R. 62-4–

62-9.) The Court grants summary judgment to the defendant as to Counts VII and VIII.

## CONCLUSION

For the reasons articulated in this Order, the defendant's motion for summary judgment [78] is granted. Civil case terminated.

Date: January 21, 2026

_____
JEREMY C. DANIEL
United States District Judge